A.N. DERINGER, INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 92–02–00080

(Dated August 13, 1996)

*Barnes, Richardson & Colburn (James S. O'Kelly* and *Robert H. Schor),* for plaintiff.
*Frank W. Hunger,* Assistant Attorney General; *Joseph I. Liebman,* Attorney-in-Charge, International Trade Field Office, U.S. Department of Justice, Commercial Litigation Branch, Civil Division *(Bruce N. Stratvert);* Office of Assistant Chief Counsel, U.S. Customs Service *(Edward N. Maurer),* of counsel, for defendant.

OPINION

GOLDBERG, *Judge:* This matter comes before the court following trial *de novo.* Plaintiff, A.N. Deringer, Inc. ("Deringer"), a customs broker acting as the importer of record, challenges the decision of the U.S. Customs Service ("Customs") denying Deringer's protest against Customs' liquidation of the subject merchandise. All conditions precedent to this

action have been satisfied, and the court exercises its jurisdiction pursuant to 28 U.S.C. § 1581(a) (1988).

One entry of the merchandise at issue, No. 551–0591232–7, was imported through the port of Champlain on January 27, 1988. The merchandise was entered under Item 145.26 of the Tariff Schedules of the United States ("TSUS"), which provided for "Other edible nuts, shelled or not shelled, blanched, or otherwise prepared or preserved: Not shelled: Pistache," at the duty rate of 45¢ per pound and at a value of $17,734.00. *Joint Statement of Uncontested Facts,* ¶¶ 1–4. Deringer alleges that it did not receive any notices of extension or suspension of liquidation from Customs after the date of entry. Consequently, Deringer argues that pursuant to 19 U.S.C. § 1504 and 19 C.F.R. § 159.11–12, the subject merchandise was deemed liquidated by operation of law on the anniversary of the date of entry, January 27, 1989, at the rate of duty, value, quantity, and amount of duty asserted by the importer at the time of entry. *Plaintiff's Pretrial Brief* at 2. Deringer asks the court to hold Customs' subsequent liquidation of the entry on February 22, 1991, assessing additional duties, invalid.

The government argues that Customs provided the requisite notices within the meaning of the statute and regulations. Accordingly, the government argues that Customs' liquidation of the subject entry on February 22, 1991 was lawful and should be sustained by the court. *Defendant's Pretrial Memorandum* at 5–14.

In this case, the court must analyze what the law requires Customs to do in order to extend the period for liquidation of entries. The court must also decide whether Customs complied with the law such that its liquidation of February 22, 1991 may be held valid. Because the court finds that Customs properly extended the period for liquidation of the subject entry in accordance with the statute and regulations, the court holds that Customs' February 22, 1991 liquidation of this entry is valid.

## I. Findings of Fact

A. *Deringer's Case:*

At trial, Deringer's chief witness was Cindy Fresn, a Deringer employee since 1984. Ms. Fresn testified that in her capacity as a post-entry clerk she is responsible for processing, *inter alia,* notices of extension or suspension of liquidation. Ms. Fresn testified that upon the delivery of mail to Deringer, it is Deringer's practice to have a mail clerk segregate all notices of extension or suspension of liquidation and hand them to Ms. Fresn unopened. Ms. Fresn testified that she was the only Deringer employee responsible for processing extension or suspension notices in 1988 and 1989. In particular, Ms. Fresn testified that Deringer's mail clerk during that period, Ms. Joyce Boyce, did not process such notices.

Customs provides notices of extension or suspension of liquidation on Form 4333–A.[1] According to Ms. Fresn, upon receiving the mail from the postal carrier, Deringer's mail clerk is able to segregate all such notices based upon the distinctive envelope utilized by Customs to mail Form 4333–A. After Ms. Fresn receives these segregated notices from the mail clerk, she processes them in the following manner: she opens notice; she accesses Deringer's computer to ascertain which company is involved, as the form is completed in Deringer's name; and she completes an "out-card" which includes, *inter alia,* the date that the entry was pulled and whether there was an extension or suspension of liquidation. This out-card will be placed in Deringer's files to indicate that a particular entry file has been removed. Ms. Fresn then pulls the entry file which matches the extension or suspension notice and forwards the file and notice to Deringer's "classifier" for the subject merchandise who will assess the basis for the extension or suspension of liquidation. This classifier likely would have been involved with the original preparation of the entry.

Following such review, if the classifier is satisfied with the propriety of Customs' action, the entry file and attached notice are returned to Ms. Fresn who then forwards the original Form 4333–A to the shipper in Canada and retains a photocopy of the notice with the entry file for Deringer's records. If, however, the classifier finds fault with Customs' action, the classifier will temporarily retain the entry file and attached notice, while investigating the basis for the extension or suspension with Customs. Once such investigation is complete, the classifier will return the entry file and attached notice to Ms. Fresn who will process the notice in the manner noted above. Thus, in virtually all cases, the original notice of extension or suspension of liquidation is returned to Ms. Fresn who then forwards this original to the shipper in Canada.[2] Ms. Fresn includes an invoice for services rendered in forwarding the original Form 4333–A to the client, a copy of which is also placed in Deringer's entry file. The foregoing procedures are not memorialized in writing by Deringer, but instead were passed on to Ms. Fresn by her predecessor and have not since changed. Ms. Fresn spends approximately three to four hours each day processing notices of extension or suspension of liquidation in this manner.

With regard to the entry at issue in this case, Ms. Fresn testified that had Deringer received a notice of extension or suspension of liquidation, it would have been processed in accordance with the described procedure. To the best of her knowledge, Ms. Fresn does not recall seeing a notice of extension or suspension of liquidation concerning the subject

---

[1] The court notes that during the period at issue in this case, i.e. 1988 and 1989, Form 4333–A contained an insert which provided the actual notice of extension or suspension of liquidation. Customs no longer utilizes this insert. Instead, the information is printed on the back of the envelope; the information is now viewed by removing a perforated tab on the side of the envelope and peeling the front portion of the envelope away from the back portion.

[2] With regard to certain of the countervailing duty cases involving merchandise from Canada, Ms. Fresn is not required to forward the original Form 4333–A to the Canadian shipper; in such cases, the original notices are instead placed in Deringer's files at the client's request.

entry. Further, Ms. Fresn reviewed her file concerning the subject entry prior to testifying in court and failed to find any record of a notice of extension or suspension of liquidation concerning this entry. Indeed, the file did not contain any correspondence from Ms. Fresn to the shipper concerning notices of extension or suspension of liquidation. Based upon the foregoing, Ms. Fresn assumes that Deringer never received a notice of extension or suspension of liquidation concerning the subject entry.

Ms. Fresn further testified that, on average, she processes approximately 500 to 1000 notices of extension or suspension of liquidation each week; this is the same number of notices she processed in 1988 and 1989. During her absences from work, such as when Ms. Fresn takes vacation or maternity leave, these notices are given to either the assistant manager or Deringer's branch manager in Champlain, who has a file clerk pull the entry files for delivery to the appropriate classifier. According to Ms. Fresn, despite the large number of files involved, she adheres to an unwritten policy by which the entry files and associated notices are always hand delivered to the appropriate classifier, and by which the classifiers always return the files to Ms. Fresn by hand delivery. Ms. Fresn testified that she never leaves files on an absent classifier's desk or in the classifier's in-box because of her concern that the files will be misplaced or lost. It is unclear how Deringer's classifiers return these files during those periods in which Ms. Fresn is absent from work.

Once Ms. Fresn is ready to generate an invoice for forwarding an original notice of extension or suspension of liquidation to the shipper in Canada, she enters the information into plaintiff's computer system. An invoice is not generated until the next morning. Thus, Ms. Fresn maintains a tray of up to 200 entry files on her desk awaiting generation of an invoice.

Ms. Fresn testified that Deringer does not maintain a log book of notices of extension or suspension of liquidation received from Customs, or of any mail received from Customs. Further, Deringer does not maintain a log of outgoing mail which would indicate the receipt and processing of an extension or suspension notice for the subject entry.

As noted, Ms. Fresn testified that during the period that the defendant asserts that notices of extension and suspension of liquidation were sent to the plaintiff, Deringer employed Joyce Boyce as its mail clerk. As the primary recipient, Ms. Boyce would have been the first Deringer employee to handle any notices of extension or suspension of liquidation concerning the subject entry. Significantly, however, Ms. Boyce was not called to testify on behalf of the plaintiff. Indeed, Deringer did not even attempt to explain her absence at trial despite the fact that Ms. Boyce continues to be employed by Deringer, albeit in a different capacity. As a result, the court is unable to formulate a comprehensive assessment of the reliability of plaintiff's personnel and procedures for handling incoming mail during the period at issue in this case.

Deringer also called Gregory G. O'Mahony to testify at trial. Mr. O'Mahony was employed by Deringer's surety, Fidelity and Deposit of Maryland ("Fidelity"), as a claims attorney from 1981 to 1993. In that capacity, Mr. O'Mahony handled all claims coming into Fidelity's office in Quincy, Massachusetts. Mr. O'Mahony was solely in charge of the Deringer file. As a result, all correspondence involving Deringer, including notices of extension or suspension of liquidation from Customs, would be brought to his attention.[3]

Mr. O'Mahony testified that, upon receipt of extension or suspension notices from Customs, he would send Deringer a form letter inquiring as to its position and intentions regarding the notices. Mr. O'Mahony would include the original notices from Customs with this correspondence. According to Mr. O'Mahony, Deringer had an extremely good track record in responding to his inquiries. On average, Mr. O'Mahony forwarded approximately 50 such notices to Deringer each month.

Prior to testifying at trial, Mr. O'Mahony reviewed Fidelity's files concerning Deringer dating back to October 1988. He did not find any correspondence to or from Deringer concerning a notice of extension or suspension of liquidation for the entry at issue in this case. Based upon this, Mr. O'Mahony concludes that Fidelity never received such notices from Customs.

On cross-examination, Mr. O'Mahony testified that Customs' notices were mailed to Fidelity's post office box located in Baltimore. A Fidelity employee would pick up the mail each day from this post office box and bring it to Fidelity's Baltimore office. The Customs notices were then opened and all notices concerning Fidelity's Quincy office, including all notices involving Deringer, were sent to Mr. O'Mahony in a sealed envelope on a weekly basis. According to Mr. O'Mahony, the Fidelity employee that reviewed the Customs notices in Baltimore was able to distinguish those notices concerning Deringer based upon the code "551" that would appear on the notices.

Finally, Mr. O'Mahony noted that upon receipt of the sealed envelope by Fidelity's claims department in the Quincy office, the office supervisor would open the envelope and distribute the notices and attached memos from the Baltimore office to Mr. O'Mahony and his sole colleague in the department. Mr. O'Mahony would then have his secretary generate form letters for each of the notices that he received.

The court finds that the testimony proffered by plaintiff to establish Fidelity's nonreceipt of extension or suspension notices suffers from much the same defect as the testimony proffered to establish Deringer's nonreceipt of such notices. Mr. O'Mahony's testimony holds little persuasive value because neither Fidelity's clerk in the Baltimore office who segregated the mail and forwarded extension and suspension notices to Mr. O'Mahony, nor the office supervisor who distributed the

---

[3] The court notes that it is not necessary for Customs to send an extension notice to a surety such as Fidelity. *Old Republic Ins. Co. v. United States,* 10 CIT 589, 596, 645 F. Supp. 943, 950 (1986).

notices to the claims attorneys in the Quincy office, were called to testify at trial. Furthermore, plaintiff made no attempt to explain their absence.

Charles Di Prinzio, Deringer's assistant branch manager in the Champlain office during 1988 and 1989, also testified at trial. Mr. Di Prinzio testified that he was directly responsible for the subject entry during this period. Mr. Di Prinzio reviewed Deringer's entry file prior to testifying, and did not locate any records of extension or suspension notices concerning the subject entry. Mr. Di Prinzio further testified that he has no recollection of receiving such notices from Customs in 1988 or 1989. Upon leaving the Champlain office in September 1989, Mr. Di Prinzio turned this file over to Mike Leahy. If during his tenure Mr. Di Prinzio had been unavailable to handle a matter that arose with regard to the subject entry, the matter would have been referred to the branch manager.

On cross-examination, Mr. Di Prinzio testified that at any one time the active files that he maintained in his office, such as the subject entry file, numbered less than fifty. Mr. Di Prinzio does not recall that Ms. Fresn ever brought him an extension notice concerning any of these files. According to Mr. Di Prinzio, the subject merchandise was originally entered as a consumption entry. In July or August of 1988, Deringer received a notice of proposed action from Customs for an additional assessment, including, *inter alia,* countervailing duties, based upon Customs' view that the true country of origin of the subject merchandise was not the country of origin stated on the original entry. At that time the subject entry file gained notoriety in Deringer's Champlain office because Deringer requested payment from the Canadian shipper of several hundred thousand dollars to cover this additional assessment. As the importer of record, Deringer ultimately paid liquidated damages equal to the cost to redeliver the merchandise.

In 1988, Mr. Di Prinzio assumed responsibility for some of Ms. Fresn's duties during her absence on maternity leave. Mr. Di Prinzio did not personally perform these duties, but had the work split between other people in his office. As the assistant manager, Mr. Di Prinzio had approximately 60 to 70 people working under him in the Champlain office. Notably, Mr. Di Prinzio stated that although he did on occasion return files to Ms. Fresn by hand delivery, he could not say that he never relied upon others in his office to return the files for him. Finally, Mr. Di Prinzio testified that the question of whether the period for liquidation of the subject entry had been extended never occurred to him, because he never received a final duty bill from Customs for this entry during the period that he worked in the Champlain office.

Mike Leahy, who succeeded Mr. Di Prinzio as assistant branch manager in Champlain in September 1989, held this position until June 1992. Mr. Leahy testified that he met with Mr. Di Prinzio in September 1989 and reviewed all active files, including the subject entry file. At that time, the issue of liquidated damages had not been resolved with

Customs. This was apparently the most prominent aspect of the subject entry file at the time that Mr. Leahy succeeded Mr. Di Prinzio. Mr. Leahy testified that he does not recall seeing any record of a notice of extension of liquidation issued by Customs in 1988 at the time he reviewed the subject entry file in 1989. In addition, Mr. Leahy does not recall receiving or learning of a notice of suspension of liquidation for the subject entry in November or December of 1989. Prior to testifying in court, Mr. Leahy reviewed Deringer's entry file and did not find any evidence of notices of extension or suspension of liquidation for the subject entry. If such notices had been received by Deringer, Mr. Leahy would have expected to find copies of them in the file. Mr. Leahy further testified that the Canadian shipper never attempted to contribute to payment of the duties or penalties assessed in this matter.

On cross-examination, Mr. Leahy stated that because the issue of liquidated damages was still pending when he assumed responsibility for the subject entry file, any query concerning the liquidation status of the entry would have been pointless at that time. Although Mr. Leahy generally recalls conversations with Customs concerning the subject entry, he does not recall any specific conversations concerning extension or suspension of the period for liquidation.

Further, Mr. Leahy noted that Deringer switched sureties shortly after January 1988 from Fidelity to Washington International. While Mr. Leahy recalls receiving correspondences from Washington International as assistant branch manager in Champlain, he does not recall any correspondences from Fidelity concerning notices of extension or suspension of liquidation. Mr. Leahy does, however, recall form letters from Fidelity concerning liquidated damage claims. Notwithstanding Deringer's switch in sureties, Mr. Leahy stated that had Fidelity received a notice of extension or suspension of liquidation concerning one of its active files with Deringer, Fidelity would have forwarded a memo concerning the notice to Deringer. Mr. Leahy also stated that he should have been aware of any such correspondence, but if he had been absent from work, such correspondence would have been given to the branch manager.

Significantly, Mr. Leahy testified that, on occasion, Ms. Boyce was brought in to process extension and suspension notices, either because of a backlog or because Ms. Fresn was absent from work. Mr. Leahy believes that, at times, Ms. Boyce and Ms. Fresn worked together to process such notices. During Ms. Fresn's absences, Ms. Boyce could have processed these notices alone. According to Mr. Leahy, the processing of extension and suspension notices was not an urgent matter, and although the office preferred that the notices be processed as they were received, backlogs did occur.

When Deringer received a notice of extension or suspension of liquidation concerning one of the active files that Mr. Leahy maintained in his office, the entry file would be returned to Mr. Leahy after Ms. Fresn forwarded the original notice plus invoice to the shipper in Canada. Mr.

Leahy believes that these notices and associated entry files were, for the most part, hand carried within the office. Mr. Leahy acknowledges, however, that on occasion, he forwarded a notice and entry file to Ms. Fresn via office mail.

Mr. Leahy admitted that he would not have been surprised if Customs issued a notice of suspension of liquidation for the subject entry because of the countervailing duty issue involved. Mr. Leahy stated that the country of origin of the subject merchandise was still at issue in September 1989.

Upon consideration of the evidence, the court finds that the failure to present testimony from the primary recipients of the mail, both at Deringer and at Fidelity, undermines Deringer's claim of nonreceipt. A claim of nonreceipt in this context must be scrutinized carefully by the court, given the incentive that a plaintiff may have to claim that no notice was received. In order to establish nonreceipt, plaintiff should have introduced testimony from each available person who would have had contact with the incoming mail in the ordinary course of business. This would have allowed the court to formulate a comprehensive assessment of the reliability of both the personnel and procedures employed to process the mail once it was received. *Cf. Sanford Steel Pipe Products Co. v. United States,* C.D. 4359, 68 Cust. Ct. 192, 195 (1972) (finding that plaintiff failed to establish nonreceipt of notice of appraisement because plaintiff failed to introduce testimony of the primary recipient, i.e., plaintiff's mailroom employee, and plaintiff failed to explain this individual's non-appearance at trial).

The absence of the primary recipient of incoming mail in Deringer's Champlain office during the period under review, Ms. Boyce, is particularly disturbing. The evidence indicates that, on occasion, Ms. Boyce herself could have processed notices of extension or suspension of liquidation, without the assistance of Ms. Fresn. Deringer has failed to explain, however, why Ms. Boyce was not called to testify at trial despite her apparent availability and despite the fact that her testimony is integral to plaintiff's case.

Even if the court were to disregard this gap in the testimony concerning Deringer's processing of incoming mail, based upon the court's assessment of the credibility of the testimony introduced by plaintiff, the court is not persuaded that Deringer's procedures for handling the large number of notices of extension and suspension of liquidation received each week are as foolproof as Ms. Fresn depicted in her testimony. The court observes that Ms. Fresn portrayed Deringer's internal procedures in unequivocal terms indicating that, once received, all extension and suspension notices are accounted for in Deringer's entry files. Ms. Fresn based this view in part on her testimony that Deringer's entry files and associated extension and suspension notices never leave human hands; they are hand delivered between personnel or not delivered at all. Yet, this testimony was directly contradicted by Mr. Leahy, who noted that, on occasion, Deringer's internal mail would be utilized

to forward entry files and associated extension and suspension notices to the appropriate person within the company. Given Ms. Fresn's extensive personal familiarity with Deringer's handling of extension and suspension notices since 1984, her failure to acknowledge the occasional use of Deringer's internal mail distribution system seriously undermines the credibility of her testimony. Furthermore, Ms. Fresn testified that she was solely responsible for processing such notices when, according to Mr. Leahy, others within the company including Ms. Boyce would either assist or assume this responsibility. This also undermines the credibility of Ms. Fresn's testimony. In short, the court remains skeptical that Deringer's internal procedures, and the implementation of such procedures, perfectly account for all incoming mail so as to preclude the occasional misplacement of extension and suspension notices. The absence of corroborating records in plaintiff's entry file fails to provide a sufficient basis for concluding that Deringer never received a Form 4333–A in this case.

For all of the foregoing reasons, the court finds that Deringer has failed to establish nonreceipt of the Customs notices at issue.

B. *The Government's Case:*

For its part, the government begins by relying on two related presumptions. First, to establish mailing, the government relies upon the presumption of regularity that attaches to the acts of government officials. *See, e.g., International Cargo & Surety Ins. Co. v. United States,* 15 CIT 541, 544, 779 F. Supp. 174, 177 (1991) (finding that presumption of regularity gives rise to a presumption that notice in accordance with statutory and regulatory requirements has been given). Second, proof of mailing raises a presumption of delivery. *Intra-Mar Shipping Corp. v. United States,* C.D. 4160, 66 Cust. Ct. 3, 5–6 (1971). That presumption is rebuttable by proof of nonreceipt. *Id.* The Federal Rules of Evidence address presumptions in civil actions in Rule 301, which states:

> [A] presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of non-persuasion, which remains throughout the trial upon the party on whom it was originally cast.

As the Advisory Committee Notes to Rule 301 state, presumptions governed by this rule place upon the opposing party the burden of establishing the nonexistence of the presumed fact, once the party invoking the presumption establishes the basic facts giving rise to the presumption.

The government acknowledges that it does not have direct proof that the notices at issue were mailed to Deringer. To establish such mailing, the government first called John Ryan, an import specialist with Customs, to the stand. Mr. Ryan processed the subject entry from beginning to end in the port of Champlain. Mr. Ryan identified *Exhibit B* as Customs' lab report which concludes that the subject merchandise is of Iranian origin, and not Turkish origin as was claimed at the time of entry.

Upon receipt of this report, Mr. Ryan ordered redelivery of the goods because importation of Iranian goods into the United States was prohibited at that time. Mr. Ryan identified *Exhibit C* as the CF ("Customs Form") 4647 that he issued on March 29, 1988, ordering redelivery of the goods. Mr. Ryan also identified *Exhibit M* as the CF 29 (notice of proposed action) he issued on July 22, 1988, notifying Deringer of the potential for countervailing, antidumping, and marking duties.

Mr. Ryan testified that shortly after the subject entry was received in his office, he had the entry withdrawn from the liquidation cycle and identified with a holding code as an entry subject to review. Mr. Ryan identified *Exhibit D* as the automatic liquidation alert report that is received following eight months of an entry remaining unliquidated. This report was processed on October 7, 1988, and lists Entry No. 551–0591232–7. This report alerted Mr. Ryan that the subject entry was approaching its liquidation date and that he either had to liquidate the entry or take action to prevent the entry's liquidation by operation of law. Mr. Ryan testified that he then asked Customs' entry control section to extend the period for liquidation of this entry. Mr. Ryan did so by marking the subject entry, as well as other entries on the automatic liquidation alert report, with the handwritten notation "E1", and forwarding the report to entry control section. Mr. Ryan identified the handwritten notation of "E1" on *Exhibit D* as his request for extension of the subject entry. Mr. Ryan also identified the notation "To Ann * * * 10/25/88" on *Exhibit D* as an instruction to the entry aid who inputs such extensions into Customs' computer system for changing the liquidation status of an entry. Mr. Ryan testified that Ann works in Customs' entry control division in Champlain, and that she would input his extension instructions into the computer with a day or two of receiving them.

Mr. Ryan identified *Exhibit E* as the automatic liquidation alert report processed on November 17, 1988. Notably, the subject entry does not appear on this report. As a result, Mr. Ryan concludes that the liquidation period for the subject entry had been extended.

Mr. Ryan also identified *Exhibit H* as the automatic liquidation alert report processed on October 14, 1989. This report alerted Mr. Ryan that the second anniversary of the subject entry was approaching and that therefore additional action was required. Mr. Ryan identified his handwritten notation of "E04" next to Entry No. 551–0591232–7 on *Exhibit H* as his instruction that the basis for withholding liquidation be changed to a suspension of liquidation for countervailing duties. *Exhibit H* also contains Mr. Ryan's handwritten instructions to "[p]lease extend/suspend all E–1 & E–4 entries."

Mr. Ryan identified *Exhibit I* as the automatic liquidation alert report processed on November 10, 1989. Notably, this report does not list the subject entry. Mr. Ryan stated that this was to be expected because the report was generated after he instructed that liquidation of the subject entry be suspended.

Mr. Ryan also identified *Exhibit F* as a report of entries that had been extended or suspended within the previous nine to twelve months, dated November 17, 1988. This report lists Entry No. 551–0591232–7 as having had the liquidation period extended once.

Mr. Ryan further identified *Exhibit J* as a report of entries that had been suspended as of November 10, 1989. This report lists the subject entry as a countervailing duty entry included among the group of suspended entries. In addition, Mr. Ryan identified *Exhibit K* as a report of entries that had been extended or suspended within the previous nine to twelve months, dated November 10, 1989. This report also lists Entry No. 551–0591232–7 as having been suspended. Finally, Mr. Ryan identified *Exhibit L* as the final liquidation instructions from the U.S. Commerce Department concerning the countervailing duty case on in-shell pistachios from Iran, dated February 1, 1991. Mr. Ryan testified that, as a result of receiving these instructions, he issued another CF 29 notifying the importer that countervailing duties would be assessed in accordance with Commerce's instructions.

The government also called Arthur Versich to the stand. Mr. Versich is a branch chief in the commercial systems development division of Customs' Automated Commercial Systems ("ACS") office located in Washington, D.C. Mr. Versich is responsible for maintaining Customs' automated system for issuing extension and suspension notices. Mr. Versich testified that Customs' extension/suspension sub-program is one of several programs run at the end of each week to produce reports, notices, etc. To sum up Mr. Versich's testimony, an initial computer program is run to canvass all entry master files and extract those files which need to be acted upon in a given week. A second program is then run to extract from those files the entries for which extension or suspension notices must be mailed. The information is saved in a computer file and put into a print format. This file is then sent to the print spool. During this process, the previous week's file of records for which extension or suspension notices were mailed is erased, and the current week's file is saved. Finally, Customs' extension/suspension history file is updated with the current week's information. Mr. Versich noted that, since 1986, this information concerning the extension or suspension of entries has been available electronically to those importers who have opted to participate in Customs' Automated Broker Interface ("ABI").

Mr. Versich further testified that all of Customs' databases and records reside in Virginia; that is where reports such as the liquidation alert reports identified by Mr. Ryan are generated. The liquidation alert reports are then sent to the import specialists at the various ports to decide what action to take. In this case, the liquidation alert reports were sent to print directly at the port of Champlain. Mr. Versich testified that the import specialist would typically note which entries were to be extended or suspended directly on the report. Then the import specialist would forward the report to the office's entry control operator who

would bring up the appropriate ACS screen on the computer system[4] and input whether the import specialist directed an extension or suspension of liquidation. If input of the decision to extend or suspend was successful, the operator would receive a message stating that the entry had been updated. Once the operator inputs the extension or suspension code, this updates the entry's master file and that is how the entry is picked up at week's end by Customs' program as an entry requiring issuance of a notice of extension or suspension of liquidation.

Mr. Versich also testified that, due to sheer volume, Customs does not retain paper copies of extension or suspension notices. Since 1979, Customs has maintained an extension/suspension history file on computer tape; this file indicates those entries for which notices of extension or suspension of liquidation have been issued. Mr. Versich identified *Exhibit N* as a report from Customs extension/suspension history file concerning the subject entry. According to Mr. Versich, *Exhibit N* indicates that four notices were sent. More specifically, notices of extension of liquidation were sent to Deringer and to Fidelity which were processed for printing on October 29, 1989. Notices of suspension of liquidation were sent to Deringer and Fidelity which were processed for printing on November 4, 1989. Mr. Versich concludes that Customs printed and mailed the notices of extension and suspension indicated on *Exhibit N.*

Finally, Mr. Versich testified that in 1989 Customs discovered that, since 1986, approximately 2000 to 3000 suspension notices for entries subject to antidumping or countervailing duties had not been generated and mailed at the appropriate time. Those entries for which notices had not been generated did not appear in Customs' extension/suspension history file at that time. However, once Customs corrected the error and mailed the notices, the extension/suspension history files were updated. Mr. Versich stated that Customs has never had to make any changes to its extension/suspension computer program that involved consumption entries.

On cross-examination, Mr. Versich acknowledged that *Exhibit N* indicates that four notices were scheduled, in that they were queued on the print spool for printing. It does not reflect what was actually printed or any problems that may have been encountered with regard to such printing. According to Mr. Versich, the actual printing of the extension and suspension notices may have occurred on the day following the "Run Date" listed on *Exhibit N.*

Mr. Versich further noted that the data in Customs' extension/suspension history file is not used to supply the reports that are sent to the field. Rather, such reports are based upon the information contained in each entry master file. It is the entry master file that is updated when

---

[4] In the case of an extension, the operator would bring up the ALQE screen; in the case of a suspension, the ALQS screen was utilized. In either case, the operator would input the entry number; the decision to extend or suspend; and whether the action was requested by the importer or by Customs.

the branch office's entry control operator inputs the code for extension or suspension of liquidation for a particular entry.

Lastly, the government called Roger Odom to the stand. Since June 1989, Mr. Odom has been employed as supervisor of the production management and computer operation sections for two computer data centers in Virginia. As such, Mr. Odom is responsible for all phases of operation at these data centers, including the generation and mailing of notices of extension or suspension of liquidation which occurs at the older of the two centers. Prior to June 1989, Mr. Odom was responsible solely for law enforcement operations, which occurred at the newer data center. Mr. Odom testified that his current staff of personnel who schedule, generate, and mail notices of extension and suspension of liquidation from the older data center is the same one that Customs employed in 1988 and that, to his belief, the same procedures are employed. The notices at issue in this case would have been issued from that data center.

Mr. Odom testified that his staff utilizes an automated scheduling system called "CA7" that has been pre-programmed to begin the process of generating extension/suspension notices each Saturday; this is but one of many jobs that CA7 initiates. Mr. Odom's staff monitors CA7 and the system to ensure that all jobs are executed and completed successfully. According to Mr. Odom, his staff knows that each program is completed successfully because: (i) CA7 would detect any error; (ii) his staff manually checks the system to ensure success; and (iii) at the end of each program, a number is returned to the system called a "return code". Usually a return code of zero is received, which indicates that the job has been completed successfully. CA7 is instructed to begin the next job only if a return code of zero is received, indicating that the previous job has been completed successfully.

Mr. Odom further testified that the job of generating extension and suspension notices is comprised of several elements. First, the print spool is created, i.e., the information is placed in a holding area of the printer. If this occurs successfully, a return code of zero is received. The next step is to load the CF 4333–A forms into the printer by means of the pinhole feeds on each side of the form, perform an alignment test, and check on the clarity of the print. Notably, one aspect of the alignment test is to ensure that the name and address of the addressee appears in the proper location on the face of the CF 4333–A envelope.

Once satisfied, the printer operator instructs the system that printing may begin. The operator monitors the printer from start to finish of the job, to ensure that there are no jams and that other problems do not arise. The operator will know that the print job has been completed successfully if a return code of zero is received upon completion. If, however, the printing is interrupted, a return code other than zero is received, and the operator, in conjunction with Mr. Odom's staff, would complete the printing on an alternative printer. In that case, Mr. Odom's staff would ascertain the last form that was successfully printed, access the

print spool file, and instruct the system to resume printing the forms at some point prior to the last successfully printed form in order to check for proper alignment, clarity, etc. The duplicate forms are later detached and discarded. The print job is then completed as usual. If both printers should fail to operate properly, the print spool file remains intact and is available to complete the process once a printer is repaired.

Mr. Odom stated that the CF 4333–A forms are fed into the printer in batches numbering approximately 1000. When a batch is depleted, the printer halts and another batch is reloaded into the printer. The operator then instructs the system that printing may resume. According to Mr. Odom, as many as ten boxes of forms may be used each week.

Mr. Odom also testified that, following the successful completion of a print job, the forms are fed into a "decolator" which removes the top sheet, i.e., the alignment sheet, from each of the forms. The forms are then fed through a "burster" which: (i) separates the forms from each other by tearing the perforations found at the top and bottom of each form; and (ii) separates the pinhole feeds located on the sides of each form which are used to feed the forms through the printer. The final product is a stack of postage paid envelopes with an address and return address printed on the face of each and with the appropriate information printed on the inside; this internal printing is achieved because certain areas internal to the envelope comprising CF 4333–A act as carbon paper.

Finally, the stack of completed CF 4333–A forms is placed directly into a mail tray; when a mail tray becomes full, that tray is placed in a mail cart. A postal carrier arrives at the data center each day at 11:00 a.m. and collects the mail, including any CF 4333–A forms that have been placed in mail trays. Mr. Odom testified that, to the best of his knowledge, all notices printed at his facility are mailed successfully.

According to Mr. Odom, the foregoing standard operating procedures have been utilized to generate and mail extension and suspension notices each week since June 1989 and, to the best of his belief, are identical to the procedures used in 1988. Mr. Odom bases this testimony on his understanding that the documentation associated with the procedures for extension/suspension notices has not changed since at least 1988.

On cross-examination, Mr. Odom testified that the process of generating extension and suspension notices begins on Saturday and normally extends into Sunday of each weekend. Occasionally, this process is not completed until the following Monday or Tuesday. Mr. Odom acknowledged that he does not work weekends, but that on Monday mornings he inquires specifically into whether the extension/suspension notices have been completed.

Mr. Odom further testified that the return code is saved in the computer system log; this is where CA7 looks to determine whether a return code of zero has been received, indicating that the next job may be started. The computer system log is removed nightly and is retained on

tape for approximately six months to one year and then destroyed. Consequently, the computer system logs that would indicate whether a return code of zero was received for the notices at issue in this case are no longer available.

Mr. Odom also noted that an alignment sheet contains everything that is printed on the inside of a CF 4333–A. Mr. Odom testified that the alignment sheets were previously retained by Customs but, due to sheer volume, are now discarded. Indeed, since at least June 1989, these alignment sheets have been shredded and then discarded. Consequently, such physical records of the notices at issue in this case are no longer available.

Based upon a review of all of the evidence presented at trial, the court finds that the government has introduced sufficient evidence to invoke the presumption of regularity in this case. The court also finds that the plaintiff has failed to rebut this presumption. Accordingly, the court finds that Customs is presumed to have generated and mailed the notices that are at issue.

## II. CONCLUSIONS OF LAW

The court notes that at the time the subject merchandise was imported into the United States, 19 U.S.C. § 1504(a) (1988) stated that, except as provided in subsection (b), an entry of merchandise not liquidated within one year from the date of entry of such merchandise "shall be deemed liquidated at the rate of duty, value, quantity, and amount of duties asserted at the time of entry by the importer of record." Pursuant to § 1504(b), however, Customs

> may extend the period in which to liquidate an entry by giving notice of such extension to the importer of record in such form and manner as [Customs] shall prescribe in regulations * * *.

Further, with regard to suspension of liquidation, § 1504(c) states that if the liquidation of any entry is suspended,

> [Customs] shall, by regulation, require that notice of such suspension be provided to the importer of record concerned and to any authorized agent and surety of such importer * * *.

The regulations that were promulgated as a result of the foregoing statutory provisions, and which were in effect at the time the subject merchandise was imported into the United States, may be found at 19 C.F.R. § 159.12 (1987). Subsection (b) of this regulation states that "[i]f the district director extends the time for liquidation, * * * he promptly shall notify the importer or the consignee and his agent and surety on Customs Form 4333–A, * * * that the time has been extended and the reasons for doing so." Subsection (c) of this regulation states that "[i]f the liquidation of an entry is suspended as required by statute or court order, * * * the district director promptly shall notify the importer or the consignee and his agent and surety on Customs Form 4333–A, * * * of the suspension."

Legislative history shows that 19 U.S.C. § 1504 was designed to expedite the liquidation process. *See, e.g., Detroit Zoological Society v. United States,* 10 CIT 133, 137 n.9, 630 F. Supp. 1350, 1355 n.9 (1986). Under the statute, Customs is afforded the discretion to choose the "form and manner" of providing notice to the importer of an extension of liquidation. As demonstrated by the regulations, Customs has chosen the ordinary mailing of a Form 4333–A to provide such notice to the importer. There is nothing to indicate that this means of providing notice fails to comply with Customs' statutory mandate.

As the Supreme Court has noted, a letter properly directed that is placed in the mail or delivered to a postal carrier is presumed to have reached its destination and to have been received by the person to whom it was addressed. *Rosenthal v. Walker,* 111 U.S. 185, 193 (1884). Thus, the onus upon the government is to establish proper mailing of the requisite notices; it then falls to the plaintiff to establish nonreceipt. To require the government to prove not only mailing, but actual receipt of Form 4333–A by the importer, would erect a virtually unassailable hurdle. Rarely, if ever, would the government possess or elicit proof of receipt from an importer claiming nonreceipt.

In this case, the court has found that Customs properly generated and mailed the requisite notices of extension and suspension of liquidation. These notices are presumed to have been received by the plaintiff. The court has also found that Deringer failed to establish nonreceipt of the Customs notices at issue. Consequently, judgment will be entered for the defendant.